**WARNER/ELEKTRA/ATLANTIC COR-PORATION, et al., Plaintiffs–Appellants/Cross–Appellees,**

v.

**COUNTY OF DuPAGE, Defendant–Appellee/Cross–Appellant.**

**Nos. 91–3847, 91–3886.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1992.

Decided April 19, 1993.

Rehearing and Rehearing En Banc Denied June 9, 1993.

---

Edward M. Kay, James T. Ferrini, Susan Condon, Imelda Terrazino, Thomas J. Skeffington, Kevin P. Caraher, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, IL, for plaintiffs-appellants.

Byron D. Knight, Sarah Hansen Sotos, Charles C. Hoppe, Jr., Knight, Hoppe, Fanning & Knight, Des Plaines, IL, for defendant-appellee.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and WILL, Senior District Judge.*

POSNER, Circuit Judge.

Damage from flooding gave rise to this diversity suit, which presents interesting questions of eminent domain. The principal plaintiff (and the only one that need be mentioned) is Warner Communications, Inc. The defendant is DuPage County, Illinois. The damage for which Warner seeks compensation (stipulated at $4.2 million) was to cassettes, compact discs, record albums, videotapes, and similar merchandise stored in a large warehouse in Bensenville, a village in DuPage County. At this warehouse, which Warner has leased since 1978, Warner receives, processes, and sorts all merchandise returned by Warner customers anywhere in the nation and all overstocked merchandise from Warner's regional distribution centers. It is a busy facility, receiving as many as ten truckloads of merchandise a day. Much of this merchandise when received is stored temporarily on the floor of the warehouse or on pallets raised four inches above the floor.

A drainage ditch runs east along the northern edge of the parcel of land on which the warehouse is located and then turns north and about 800 feet from the warehouse crosses under Thorndale Road, a county highway. Until 1978 the drainage ditch was carried under the highway in a straight culvert having a diameter of 60 inches. In 1978 the county widened the highway from two to four lanes. Repaving incident to the widening raised the surface of the highway four and a half inches and the straight culvert was replaced with one that had two right-angle bends in it.

The warehouse is on low-lying land. Rainwater occasionally collected in the warehouse's parking lot and also in the loading dock, which was sunk beneath ground level, but had not entered the warehouse itself until July 22, 1982, when torrential rains caused the drainage ditch to overflow its banks and flood the warehouse to a height of four or five inches above the floor, damaging merchandise lying on it. Warner made immediate efforts to prevent a recurrence of such damage in a future flood by placing all items on pallets or shelves raised as much as sixteen inches above the floor. But this project had not been completed when on August 7, 1982, another storm caused another flood. This flood raised the water level ten inches above the floor of the warehouse, causing further damage to merchandise that had been left on the floor or on low pallets. There was evidence that the raising of

* Hon. Hubert L. Will of the Northern District of Illinois, sitting by designation.

Thornton Road had contributed to the flooding of the warehouse by preventing water that had collected south of the road from crossing the road, and that the bends in the culvert had had a similar effect by slowing the rate at which water flowed through the culvert under and to the north of the road rather than collecting south of the road.

Warner's complaint had two counts, the first charging negligence, the second inverse condemnation. The case went to the jury with a special-verdict form that (so far as material to this appeal) instructed the jury to determine whether the county had been negligent, whether Warner had been negligent, and, in the event that both parties had been negligent, how much of the responsibility for the damage should be apportioned to Warner. The jury found negligence on the part of the county but found that Warner had been negligent too and that 70 percent of the flood damage had been due to Warner's negligence. This reduced Warner's damages to $1.2 million, and since it had already obtained $2.2 million from settlements with other defendants the jury's verdict entitled Warner to no money from the county on the negligence count. The judge entered judgment in favor of Warner for $0 and then held that the county was liable to Warner in inverse condemnation also but that this liability too should be reduced in accordance with the jury's determination of comparative negligence. 771 F.Supp. 911 (N.D.Ill. 1991). So because of the settlements Warner was again not entitled to any money from the county.

■ Warner appeals. The county cross-appeals. Although the filing of a cross-appeal is unnecessary and indeed improper when the cross-appellant is merely defending the judgment of the district court, whether on the district court's grounds or on any other grounds, *Massachusetts Mutual Life Ins. Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976) (per curiam); *Byron v. Clay*, 867 F.2d 1049, 1050–51 (7th Cir.1989), the district court did not enter judgment for the county. It entered judgment for Warner, albeit a judgment for $0. The cross-appeal attacks the

judgment, contending that the judge should have entered judgment for the county. Since the county is thus seeking an alteration in the judgment, albeit a technical one, the cross-appeal may appear to be proper—especially since the judge should have entered judgment for Warner for $1.2 million and deemed it satisfied. Warner had established liability and damages. A judgment in the plaintiff's favor for zero dollars is particularly anomalous in a tort case, since, as we tirelessly repeat (most recently in *Stromberger v. 3M Co.*, 990 F.2d 974, 976–77 (7th Cir.1993)), without an injury there is no tort.

■ But we do not think in fact that the county was entitled to cross appeal. The district court's judgment, *realistically,* was for the county. *That* judgment, that result, the county can defend on the ground that Warner has no claim, rather than just no net damages, since either way the zero-dollars outcome would be preserved. Maybe the county is worried (though it hasn't said so) that the judgment might be given collateral estoppel effect in a future suit against it, perhaps by some other flood victim; for an appealable though not appealed finding is usable as collateral estoppel even if the finding was against the winning party. *Partmar Corp. v. Paramount Pictures Theatres Corp.*, 347 U.S. 89, 99 n. 6, 74 S.Ct. 414, 420 n. 6, 98 L.Ed. 532 (1954). But since an unappealable finding does not collaterally estop, *LaBuhn v. Bulkmatic Transport Co.*, 865 F.2d 119, 122 (7th Cir.1988); *Restatement (Second) of Judgments* § 27, comment h (1982); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4421 at pp. 199–201 (1981), it would be bootstrapping to use the collateral estoppel effect of an appealable finding to show that an appeal is necessary to ward off collateral estoppel. If an appellant is complaining not about a judgment but about a finding (here that the county was negligent and also an inverse condemnor)—on the bottom line it prevailed—the appeal does not present a real case or controversy. So it must be dismissed for want of jurisdiction, and the finding will thus have no collateral

estoppel effect. *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939), as interpreted in *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 337, 100 S.Ct. 1166, 1173, 63 L.Ed.2d 427 (1980), is distinguishable because the Court believed that the finding that the winning party sought to appeal might have collateral estoppel effect.

There is no suggestion that any of the other defendants in this case is seeking contribution or indemnity from the county, in which event the question whether the county had engaged in wrongful conduct might affect the county's pocketbook after all. Nor does the county suggest that the judgment, like a judgment for nominal damages, has any implications for costs (which might in some cases include attorney's fees). To repeat, you can appeal, or cross-appeal, only if you have something tangible (it need not be large) to gain from the appeal. The county has not. It can get all the relief it wants merely by defending the district court's judgment on a different ground.

■ We turn to Warner's appeal. With respect to the negligence count the principal issue is the jury's reasonableness in attributing 70 percent of the responsibility for the flood damage to Warner's own negligence. Warner argues that it wasn't negligent at all but that, if it was, its negligence surely wasn't a 70 percent cause of the damage to its tapes and other property, especially when one considers that some of the responsibility should be ascribed to the builder of the warehouse, and to the Village of Bensenville, which issued the certificate of occupancy. The builder and the village, Warner argues, knew better than Warner did that the warehouse was located in a low-lying area near a drainage ditch that might well overflow and flood the warehouse.

There is no merit to Warner's argument that it wasn't negligent at all—more precisely that no rational jury could have found it negligent on the basis of the evidence presented at the trial. The parking lot and the loading dock had flooded four times between Warner's occupying the warehouse in 1978 and the flooding of the warehouse in 1982. Cf. *Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 328–29 (7th Cir.1993). A rational jury might consider it careless of Warner to have left millions of dollars worth of delicate, water-sensitive merchandise lying around on the floor of a warehouse when it should have been obvious that a severe rainstorm might send water into the warehouse itself and not just into the loading dock and the parking lot. The jury might be wrong to think this but it would not be irrational. After the first flood, moreover, when the danger of flooding was now palpable, a rational jury might suppose that a company with Warner's resources could and should have obtained the manpower and shelving needed to place the entire stock of merchandise in the warehouse above the likely highwater mark of the next flood and that it was careless not to do so.

The more difficult question is whether 70 percent is too high an estimate of Warner's responsibility for the disaster relative to that of the other defendants, including the settling defendants, principally the builder and the village. The precise question for us is not whether it is too high in fact but whether it is so contrary to the weight of the evidence that no rational trial judge would have denied the motion for a new trial. *Wassell v. Adams*, 865 F.2d 849, 854 (7th Cir.1989). The point Warner misses in its vigorous submission is the *comparative* nature of the apportionment of responsibility required by the doctrine of comparative negligence. The question is not whether Warner's negligence was great—it was not—but how it compared to that of the other defendants. We cannot say as a matter of law that it was not considerably greater than theirs, though we doubt that we would have reached the same conclusion had we been the jury. The exact nature of the county's negligence is unclear. It could hardly be faulted for raising the level of Thornton Road by a few inches, for Warner does not challenge the decision to convert the road from two lanes to four or question that to do this without

raising the level of the road would have been outrageously expensive. It does challenge the decision to bend the culvert, but the laying of a straight culvert would have required the county, at some though not necessarily a huge expense, either to acquire an additional right of way or to lay a brand-new culvert at a different location in the county's existing right of way. Had the road been lower, moreover, the rainstorms might have caused water to flow onto the road, disrupting traffic, and possibly over the road, flooding the land north of the road and perhaps causing as much damage as the rainstorms caused to Warner's warehouse operation south of the road, cf. *Whalley v. Lancashire & York Ry.*, 13 Q.B.D. 131 (1884), while if the culvert had been straighter, more water would have crossed under the road, again flooding the land north of it. No doubt the county could have done better—otherwise the jury would have assigned 100 percent of the fault to Warner—but we cannot say that the jury was unreasonable to assess Warner's fault at more than twice the county's.

In attacking the jury's finding that it was negligent, Warner lays great stress on the unforeseeable severity of the flooding. But in so doing it overlooks the fact that the county's duty to take measures to avoid flood damage was less, the lower the probability of such damage. A rainstorm of the severity that struck Bensenville twice within a two-week period in 1982 occurs on average in that area only once in every thirty to fifty years, and a rational and prudent person will expend fewer resources to guard against unusual weather conditions than against common ones. *Blyth v. Birmingham Waterworks Co.*, 11 Exch. 781, 156 Eng.Rep. 1047 (1856). The unexpectedness of the flooding affected Warner's duty of due care as well as the county's, but possibly less so. Warner faced a risk of damage from lesser flooding against which a prudent warehouser might have been expected to take precautions. It could be thought irresponsible of Warner to store such valuable and delicate merchandise on the floor of its warehouse, when the flooding of first floors, in Du-

Page County and elsewhere, is a fairly common occurrence even when no one is negligent. The shelving of Warner's stock may have been a long overdue precaution. Or so the jury might have found without taking leave of its senses.

Warner reminds us that the county is not the only defendant. But we are at a loss to understand what the builder of the warehouse, or the Village of Bensenville, should have done to prevent the damage—should the warehouse have been built on pilings, or a certificate of occupancy denied? In the latter case, surely, there would be no tort liability.

■ In defense of the district court's denial of any monetary relief to Warner on the inverse-condemnation count, the county first argues that inverse condemnation is inapplicable to personal property. A bit of background concerning the concept of inverse condemnation may be helpful to the evaluation of this argument. Consider first a world in which there is no constitutional requirement of just compensation for a taking. Even so, in the absence of legislative authorization (see, e.g., *City of East St. Louis v. St. John*, 47 Ill. 463 (1868); Ill.Rev.Stat. ch. 121 ¶ 4–501), a governmental entity would be no more entitled to take someone's property for its own use than a private person would; the taker would be a trespasser, and (if we lay to one side issues of sovereign immunity, now abolished in Illinois save as expressly provided by the legislature, Ill.Const. art. 13 § 4; Ill.Rev. Stat. ch. 85 ¶¶ 1–101 *et seq.*) could be enjoined. Laws authorizing condemnation entitle a governmental entity (and sometimes a private one as well, usually a railroad or other company needing a right of way) to take private property for its own use without the owner's consent. But because there *is* a just-compensation requirement in our world, the taker must pay the fair market value of the property. Normally it files a petition for condemnation. Suppose it does not—it just takes the property. It cannot by doing so extinguish the owner's right to the fair market value of his property. The owner can bring a suit for inverse condemnation, in effect treating the case as

one in which the taker had filed a petition for condemnation, and requiring the taker to pay the fair market value of what it has taken. This remedy (which in Illinois is judicially created, *Roe v. Cook County*, 358 Ill. 568, 570–72, 193 N.E. 472, 473 (1934)) protects the interests of the state as well as of the citizen. For it enables the state to oppose injunctions against takings on the ground that the owner's only right is to monetary compensation—the whole point of eminent domain is to prevent the owner from resisting the compelled taking of his property—*and* he can get that in the inverse-condemnation suit. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016–17, 104 S.Ct. 2862, 2879–80, 81 L.Ed.2d 815 (1984); *Lake Louise Improvement Ass'n v. Multimedia Cablevision of Oak Lawn, Inc.*, 157 Ill.App.3d 713, 717, 109 Ill.Dec. 914, 917, 510 N.E.2d 982, 985 (1987).

Nothing in the notion of "property," whether as used in the due process clause of the Fourteenth Amendment, which has been held (by incorporation of the just-compensation clause of the Fifth Amendment) to require just compensation when state government takes private property for a public use, or in the constitutional and statutory provisions of Illinois governing condemnation, limits condemnation and inverse condemnation to real property. It is rare for American governments to requisition personal property, but sometimes they do so and when they do they have to pay just compensation. *United States v. Cors*, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); *Ruckelshaus v. Monsanto Co.*, *supra*, 467 U.S. at 1001–04, 104 S.Ct. at 2871–73; *Morton Grove Park District v. American National Bank & Trust Co.*, 78 Ill.2d 353, 362, 35 Ill.Dec. 767, 771, 399 N.E.2d 1295, 1299 (1980); *Illinois Cities Water Co. v. City of Mt. Vernon*, 11 Ill.2d 547, 550–51, 144 N.E.2d 729, 731 (1957) (dictum). The county argues that if it takes personal as distinct from real property it is merely a trespasser, which seems to us not merely wrong, but imprudent, for if the argument succeeded it would curtail rather than enlarge the county's power. The county might *want* to requisition personal property, and if condemnation (and hence inverse condemnation) is inapplicable to takings of private property for public use—if therefore the county would be acting wholly outside the takings power, as when government takes property for a private rather than for a public use—it would be depriving the owner of property without due process of law (in its substantive construal). In that event it might have to pay more than the fair market value to get or keep the property—might have to pay, like any other converter, full common law damages and might be subject to an injunction as well. *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 464 (7th Cir. 1988). Sovereign immunity might shield the government itself from suit, but it would not prevent suit against the government officials responsible for the taking, in their individual capacities.

■ Which is not to say that the county is wrong to question whether what it did is aptly described as a taking or deprivation of Warner's property. It did not "take" the water-soaked merchandise, whether for a public or any other use, in any conventional meaning of the word. It would be possible but very artificial to argue that by bending the culvert and raising the road the county in effect created a reservoir south of the road in order to protect motorists on the road and landowners north of it. However the widening of the road should be characterized in relation to the control of water flow, a flood control project it was not. It is true that when a taking results in incidental injury to property not taken, that injury may be compensable as a taking. "If the Government cannot take the acreage it wants without also washing away more, that more becomes part of the taking." *United States v. Dickinson*, 331 U.S. 745, 750, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947). (But cf. *United States v. James*, 478 U.S. 597, 611, 106 S.Ct. 3116, 3124, 92 L.Ed.2d 483 (1986).) But the work on Thornton Road involved, so far as we are aware, no new taking; the damage to Warner's property therefore seems more like the consequence simply of the negligent management of public land.

The Illinois constitution—and it is on the Illinois constitution that Warner has based its inverse-condemnation claim—may appear to have erased the distinction between taking, and negligently damaging, private property. For, here deviating from the federal constitution, the Illinois constitution forbids (as do many other state constitutions, Note, "Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance," 26 *Stan.L.Rev.* 1439–40 n. 3 (1974)) the taking *or damage* of private property for public use, without just compensation. Ill.Const. art. I, § 15. This could be thought to expand the duty of just compensation beyond deliberate takings, for while one can see why the government would want to take property for its or some other's use, or regulate the use of property, it is difficult to see why it would want to *damage* property; and if deliberate damage is an empty set, maybe this means that the reference to damage must have been intended to expand the category of compensable takings beyond deliberate invasions of property. Well, it is not quite empty. Abating a nuisance comes to mind, as a case of deliberate damage; and one can imagine a case where the government pulls down a private house to create a firebreak, thus damaging private property for a public use. Either form of state action would be within what Holmes once called "the petty larceny of the police power" (1 *Holmes–Laski Letters: The Correspondence of Mr. Justice Holmes and Harold J. Laski 1916–1935* 457 (Mark DeWolfe Howe ed. 1953)) by analogy to the tort defense of public necessity (on which see W. Page Keeton *et al., Prosser and Keeton on the Law of Torts* § 24 at pp. 146–47 (5th ed. 1984)); it would thus be immune, in the absence of the sort of special statute involved in *Bowditch v. Boston,* 101 U.S. 16, 25 L.Ed. 980 (1880), from the duty to compensate. *United States v. Caltex (Philippines), Inc.,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952). Maybe the framers of the Illinois constitution wanted to change all this, but that is highly unlikely; and, in our second class of case, even if compensation were available in principle, there would always be the question whether, given the approaching fire, the house that was pulled down to create a firebreak had any positive market value at the instant before it was damaged.

An alternative interpretation, which has support in Illinois case law, is that the purpose of the constitutional provision on damage is merely to require compensation for the taking of interests, such as easements, that would ordinarily be considered a form of property but that early Illinois decisions had considered not property, confining the obligation of eminent domain to physical invasions of tangible property. *Rigney v. City of Chicago,* 102 Ill. 64, 75–76 (1881). See *Department of Transportation v. Rasmussen,* 108 Ill.App.3d 615, 621, 64 Ill.Dec. 119, 125, 439 N.E.2d 48, 54 (1982). Those early decisions had been erroneous, *United States v. Welch,* 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787 (1910), but that is neither here not there.

The third possibility, on which Warner necessarily relies, is that the reference to damage establishes a tort-like duty to compensate persons injured in their personal or real property by involuntary as well as voluntary actions by the state. *Dickinson* is but one case in which the unforeseen, unintended consequences of deliberate governmental takings were held to be themselves takings. In *Nevins v. City of Peoria,* 41 Ill. 502, 508 (1866), flooding accidentally caused by raising the grade of a road was held to be a taking; and our case is similar. See also *Cooper v. City of Johnston City,* 173 Ill.App. 470 (1912); *Sutfin v. State,* 261 Cal.App.2d 50, 67 Cal.Rptr. 665 (1968); *Granone v. County of Los Angeles,* 231 Cal.App.2d 629, 42 Cal.Rptr. 34 (1965). These cases would be easy ones if the consequences had been inevitable and therefore, in a realistic sense, intended; the taking analogy would no longer be strained. But even pure accident cases cannot help Warner. If the Illinois constitution creates a tort-like remedy in favor of private owners of property harmed as the inadvertent consequence of deliberate state action, and the harm in the particular case is the result of the state's negligence, we cannot see why the doctrine of compara-

tive negligence should not apply, just as it would in a regular negligence case.

At argument Warner's counsel conceded although grudgingly that an inverse condemnee has some duty to mitigate damages; to the extent that he can avert a fall in the market value of his property as a consequence of the government's action, he can hardly attribute that fall to that action. Although counsel refused to situate the duty in any of the familiar tort pigeonholes, we cannot imagine that if after the first flood Warner had made no effort to remove as yet undamaged merchandise from the warehouse floor, it still could claim full damages from the second flood. Granting that such contributory or comparative negligence would not be a defense, in whole or in part, to an intentional tort, *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill.2d 429, 170 Ill.Dec. 633, 593 N.E.2d 522 (1992); *Rusher v. Smith*, 70 Ill.App.3d 889, 893, 26 Ill.Dec. 905, 909, 388 N.E.2d 906, 910 (1979); *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 618 (7th Cir. 1989), all we have here, to repeat, is negligence. We find nothing in the comparative-negligence statute, Ill.Rev.Code ch. 110, ¶ 2–1116, or in the judicial doctrine of comparative negligence that preceded it, *Alvis v. Ribar*, 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886 (1981)—and that governs this case, now a decade old, because the case began before the statute's effective date—to persuade us that the name of the wrongful or invasive conduct is critical. It is true that the statute is captioned "Limitation on Recovery in Tort Actions"; and viewed simply as the mirror image of condemnation, inverse condemnation is not any sort of tort, but merely a right to demand compensation for property lawfully taken. But if by virtue of the reference to damage the Illinois constitution has expanded the term "inverse condemnation" beyond its original meaning and caused it to become a synonym for the negligent infliction of property damage, the ancillary doctrines of negligence, including the doctrine of comparative negligence, come into play and require, as the district judge held, that the 70 percent assessment of responsibility for the damage cut down any judgment to which Warner would be entitled on the inverse-condemnation count, just as on the negligence count.

The judgment is therefore affirmed, and the cross appeal dismissed.