SEA–LAND SERVICE, INC., Petitioner,

v.

DEPARTMENT OF TRANSPORTATION,
et al., Respondents.

SEA–LAND SERVICE, INC., Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

American President Lines,
Ltd., Intervenor

Nos. 93–1846, 97–1083 to 97–1085.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 12, 1997.

Decided March 13, 1998

John M. Nannes, Washington, DC, argued the cause for petitioner. With him on the briefs were Richard L. Brusca, Robert S. Zuckerman, James P. Moore and Gary A. MacDonald.

Steve Frank, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for respondent, Department of Navy, Military Sealift Command. With him on the briefs were Frank W. Hunger, Assistant Attorney General, Robert V. Zener, and Barbara C. Biddle.

Carol J. Neustadt, Attorney, Federal Maritime Commission, Washington, DC, argued the cause and filed the brief for respondent, Federal Maritime Commission.

Robert T. Basseches and John Townsend Rich, Washington, DC, were on the briefs for amicus curiae American President Lines, Ltd.

Before: WILLIAMS and ROGERS, Circuit Judges and BUCKLEY, Senior Circuit Judge.

STEPHEN F. WILLIAMS, Circuit Judge:

In 1993 the United States Maritime Administration ("MarAd") issued two orders (the "modification orders") deleting from sev-

eral of its own previous orders a clause that it had become convinced was legally invalid. In No. 93–1846 Sea–Land Service, Inc. ("Sea–Land") appealed from the modification orders. In the course of that appeal it became apparent to the court that its resolution turned in part on a question within the primary jurisdiction of, and then pending before, the Federal Maritime Commission ("FMC"); accordingly we stayed our proceedings pending the FMC's decision. That decision, appealed by both sides, is now before us in No. 97–1083 and consolidated cases. We uphold a portion of the FMC decision and do not reach the other portion. For reasons that will become apparent, our ruling on the FMC decision completely undermines MarAd's modification orders, which we accordingly vacate. With the modification orders removed from the picture, the earlier MarAd orders resume their full original effectiveness.

*    *    *

Sea–Land is an ocean common carrier, transporting containerized freight, and a U.S. citizen within the meaning of certain maritime legislation, namely 46 U.S.C. app. § 808(c)(1). In 1988 Sea–Land acquired twelve large containerships that had been built for and operated by United States Lines, Inc. until its bankruptcy in 1986. Sea–Land's purchase was made in conjunction with a Cooperative Working Agreement with two foreign carriers, P&O Containers (TFL) Limited and Nedlloyd Lijnen P.V. Under the Agreement, Sea–Land agreed to charter two of the ships to the foreign carriers for a period of time, and to charter and cross-charter space with the foreign carriers on all twelve ships. Article 5(i) of the Agreement, the source of this litigation, prohibited the foreign carriers from carrying on Sea–Land's vessels cargo that was reserved to U.S.-flag vessels under the cargo preference laws of the United States.[1]

Ocean common carriers are regulated by the Shipping Act of 1916, 46 U.S.C. app. §§ 801–842, administered by MarAd, and the Shipping Act of 1984, 46 U.S.C. app. §§ 1701–1720, administered by the FMC. Cooperative working agreements among ocean common carriers must be filed with the FMC, which must reject agreements not meeting certain formal and substantive requirements. See 46 U.S.C. app. §§ 1704, 1705(b). If not rejected, an agreement becomes effective shortly after its filing. See id. § 1705(c). If the FMC at any time determines that an agreement is "likely, by a reduction in competition, to produce an unreasonable reduction in transportation service or an unreasonable increase in transportation cost," it may seek an injunction against its operation. Id. § 1705(g). The 1984 Act exempts these agreements from the antitrust laws, but prohibits certain anti-competitive conduct. See id. §§ 1706, 1709.

If a cooperative working agreement provides for the charter of U.S.-flag ships to foreign carriers, it must also be filed with MarAd for its approval of the charter arrangements. See 46 U.S.C. app. § 808(c). Under § 41 of the 1916 Act MarAd is to approve charter agreements "either absolutely or upon such conditions as the Secretary of Transportation prescribes." 46 U.S.C. app. § 839.

Sea–Land accordingly submitted its agreement to both agencies in early 1988. The Military Sealift Command ("Sealift Command"), the branch of the Navy Department responsible for procuring transportation of military cargo, opposed Article 5(i) of the Agreement before both agencies on the grounds that it would "unreasonably restrict competition" and raise the costs of such transportation. Despite the Sealift Command's objections, MarAd issued charter orders approving the agreements. Indeed, the orders, in their Condition 4, required the parties to adhere to cargo-preference limitations identical to those of Article 5(i).

The Sealift Command's attempt to persuade the FMC to pursue an injunction proved equally unavailing. The FMC noted that Article 5(i) "raised issues under the 1984

---

1. The Cargo Preference Acts require the Department of Defense to use U.S.-flag vessels for ocean transport of military supplies and to transport at least fifty percent of all other Department cargo on such vessels if carriage is available at "fair and reasonable rates." See 10 U.S.C. § 2631(a); 46 U.S.C. app. § 1241(b)(1).

Act," but correspondence with MarAd apparently satisfied it that MarAd, in imposing Condition 4, saw its orders as "an expression of the laws and policies of the United States." This being so, the FMC advised the Sealift Command, "this agency has no authority to directly overturn an action by MarAd taken under sections 9 and 41 of the 1916 Act on any ground; such a result must be sought by [Sealift Command] in some other forum." The FMC decided to defer any decision on an investigation—a preliminary step to requesting an injunction—in order to allow the Sealift Command to pursue its challenges elsewhere.

On February 16, 1990 the Sealift Command filed a complaint against Sea–Land with the FMC, alleging that Article 5(i) violated, inter alia, § 10(c)(6) of the 1984 Act, 46 U.S.C. app. § 1709(c)(6). That section bars carriers from

> allocat[ing] shippers among specific carriers that are parties to the agreement or prohibit[ing] a carrier that is a party to the agreement from soliciting cargo from a particular shipper, *except as otherwise required by the law of the United States* or the importing or exporting country, or as agreed to by a shipper in a service contract.

46 U.S.C. app. § 1709(c)(6) (emphasis added). The Sealift Command's complaint alleged that Article 5(i) constituted a proscribed "allocation." Sea–Land responded with a motion to dismiss, based in part on a contention that the agreements were not "allocations," and in part on the proposition that they fell within § 10(c)(6)'s exception because MarAd's charter orders constituted "law of the United States" and, by incorporating the restrictive condition, "required" the cargo-preference arrangement.

The Sealift Command had also petitioned MarAd to reconsider its approval of the charter orders. MarAd denied this petition while the FMC proceeding was under way. The Sealift Command then notified the administrative law judge presiding over the FMC proceedings that it was making a "recommendation to proper higher authority for further action on the MarAd denial," and the ALJ stayed the FMC proceeding to await

the result. The "higher authority" turned out to be the Department of Defense (Sealift Command's parent Department). That Department, accurately viewing the matter as a legal dispute between two executive branch agencies, itself and the Department of Transportation (MarAd's parent), asked the Justice Department's Office of Legal Counsel ("OLC") for a resolution. The Sealift Command argued to OLC that MarAd had exceeded its authority in imposing Condition 4 as part of its charter orders.

On October 19, 1993 OLC issued a memorandum answering the agencies' claims. First, it found that Article 5(i) of the Cooperative Working Agreement was an allocation under § 10(c)(6) of the 1984 Act. It was therefore unlawful unless § 10(c)(6)'s exception for allocations "required by the law of the United States" applied. And the exception could not apply, thought OLC, because MarAd had no legal authority to validate an illegal act. As a result, MarAd on December 3, 1993 sent orders to Sea–Land modifying each of the charter orders by removing the restrictive Condition 4. Sea–Land promptly sought judicial review of MarAd's modifications here, arguing in part that the restrictive clause did not constitute an allocation of shippers within the meaning of Section 10(c)(6), and that even if it did, it was legitimized by the original MarAd orders, which counted as "law of the United States" under the "except" clause. Just after oral argument of the case here, MarAd stayed its modification orders until 20 days after our resolution of the case.

That resolution did not follow with the customary speed. After oral argument we issued an order on our own initiative staying our proceedings pending a decision by the FMC on the Sealift Command's complaint against Sea–Land. The validity of the MarAd charter conditions depended at least in part on their status under § 10(c)(6), which was, we said, a question within the primary jurisdiction of the FMC.

The FMC proceeding, of course, had itself been stayed pending our decision, so the matching stays created the risk of an Alphonse and Gaston standstill. In fact, however, the ALJ promptly lifted the stay in the

FMC proceeding. American President Lines, Ltd. ("APL"), a carrier with interests akin to Sea–Land's, was allowed to intervene to present legal arguments. After initial decisions by the ALJ, the FMC issued its report and order on December 10, 1996. The FMC agreed with OLC that Article 5(i) did constitute an allocation within the meaning of § 10(c)(6). But, disagreeing with OLC, the FMC also found that valid MarAd orders were "law of the United States," so that the arrangements in question fell within the exception, at least potentially. Whether these MarAd orders were valid depended on whether they were "within the scope of the authority delegated by Congress to [MarAd]."

This last issue, the FMC said, was beyond its jurisdiction, and already before this Court in No. 93–1846. Presuming the MarAd orders valid in the absence of any judicial decision to the contrary, the FMC found no violation of § 10(c)(6) and dismissed the Sealift Command's complaint, without prejudice to reinstitution of the proceeding following our decision in No. 93–1846. The Sealift Command, Sea–Land, and APL all appealed; we consolidated the petitions as No. 97–1083 et al.

With the ball once more in this court, we ordered supplemental briefing in No. 93–1846, limited to the question of whether MarAd was "authorized by Congress to issue charter orders which contain the military cargo restriction at issue in this case." We thus have before us the appeals from both agencies.

In No. 97–1083, we affirm the FMC's decision as to the operation of the "except" clause: valid MarAd orders are "law of the United States"; therefore, if valid, the orders here trigger § 10(c)(6)'s exception and shield Article 5(i) from its prohibitions. In No. 93–1846, we reject the Sealift Command's (and the United States's) attack on MarAd's authority to issue the orders—namely, their contention that the orders violate § 10(c)(6) itself. As that supposed invalidity was MarAd's sole ground for modifying its original orders imposing Condition 4, we vacate the modification orders, thus reviving the original orders in full.

\*　　　\*　　　\*

■ On the question of whether MarAd orders constitute "law of the United States" for purposes of § 10(c)(6)'s "except" clause, the contending parties before us are the FMC and the Sealift Command, the Command having appealed from the FMC decision. Sea–Land and APL—beneficiaries of the original MarAd orders (or parallel ones) and now caught in the crossfire between MarAd and the Sealift Command—have intervened in support of the FMC's view that the orders are "law."

The Sealift Command starts with the argument that the FMC did not decide the question we asked it to decide, so that we should decide it for ourselves without any deference to the FMC. This idea depends on a confusion of the issues—oddly, a confusion that the FMC order was at pains to dispel. The order separated the application of the "except" clause into two distinct issues. First was the law question: whether valid MarAd orders count as "law of the United States" for the purposes of the "except clause." Second was the question of whether these particular orders were valid MarAd orders, i.e., whether they were within the agency's authority. These inquiries are clearly distinct. If, for example, the Securities and Exchange Commission ("SEC") had issued the charter orders in question, a court could readily find that while valid SEC orders have the force of law, those particular ones were ultra vires and invalid. The FMC did decide the first question, and that is the one before us on review in No. 97–1083.

We thus turn to the merits of the FMC decision on whether a MarAd order is "law of the United States" within the meaning of § 10(c)(6). This is, of course, a question of statutory interpretation. But whether MarAd should have the authority to exempt carriers from the § 10(c)(6) prohibitions is a policy question, one requiring a balancing of the pro-competitive interests behind § 10(c)(6) and the rival demands of other policies, such as the promotion of the American merchant marine, entrusted to maritime agencies like MarAd. (Here the policies con-

flict to the extent that the cargo preference provisions, aimed at protecting the U.S. merchant marine by fencing off certain kinds of foreign competition, may raise the cost of U.S. military shipments.) It is precisely in answering questions of this sort that the expertise and political accountability of administrative agencies command judicial deference. See *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Health Ins. Ass'n of America v. Shalala,* 23 F.3d 412, 416 (D.C.Cir.1994).

We have in fact recognized that the FMC's interpretations of the 1984 Act are entitled to *Chevron* deference. See *Chemical Manufacturers Ass'n v. FMC,* 900 F.2d 311, 314 (D.C.Cir.1990). Such deference comes into play, of course, only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency. See *Chevron,* 467 U.S. at 842–844, 104 S.Ct. at 2781–83. The second condition is not questioned; as to the first, while the plain meaning of § 10(c)(6) may tilt too powerfully against the Sealift Command to justify the label "ambiguous," that is a defect that does not help the Command.

Violation of a condition imposed by a Mar-Ad order under § 41 is a criminal act punishable by fine or imprisonment. See 46 U.S.C. app. § 839. The Sealift Command concedes that agency orders bearing criminal sanctions for violation generally qualify as law. It argues, however, that the "except" clause was intended to exempt only the cargo preference laws of the United States and other countries. Had Congress intended to include administrative orders, the Sealift Command claims, it would have done so explicitly. The Sealift Command then offers a raft of supportive theories, arguing that the specific prohibitions of § 10(c)(6) should take precedence over any general MarAd mandate to foster the merchant marine; that Congress could not have intended to allow administrative agencies to provide exemptions from § 10(c)(6); and that a "liberal interpretation" of the "except" clause would undermine the general purpose of § 10.

The first argument is sufficiently answered by the observation that had Congress intended to exempt only cargo preference laws, it could well have done *that* explicitly. The plain meaning of a statute is (at least for starters) the one produced by reading its words to have the meaning they do in most contexts, and in most contexts, "law" includes an administrative command backed by a criminal sanction. See, e.g., *Chrysler Corp. v. Brown,* 441 U.S. 281, 295, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979) (substantive agency regulations have "force and effect of law"); *Singer v. United States,* 323 U.S. 338, 345–46, 65 S.Ct. 282, 286–87, 89 L.Ed. 285 (1945) (regulations backed by criminal sanctions are law); *General Motors Corp. v. Abrams,* 897 F.2d 34, 39 (2d Cir.1990) (regulations and orders have force of law); Black's Law Dictionary 884 (6th ed.1990) ("That which must be obeyed and followed by citizens subject to sanctions or legal consequences is a law."); see also, e.g., *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (federal regulations count as law for Supremacy Clause). The Sealift Command tells us that the FMC's position is in this context "extraordinary" and "contrary to common sense," but does not explain why. Under the FMC's reading, § 10(c)(6) allows some federal agencies to create exceptions to the section's otherwise unconditional prohibitions. Here that means that agencies charged with promoting federal maritime policies can tailor the application of § 10(c)(6) to the needs of those policies. We fail to see how such a mechanism is either extraordinary or wanting in common sense.

The Sealift Command notes that § 10(c)(6) limits its exception to requirements of "the law of the United States or *the importing or exporting country*" and would have us infer an intent to limit the exception to cargo preference laws. Of course the import/export reference does suggest the *subject matter* of the laws Congress had in mind, but Condition 4 of the MarAd charter approvals addresses that subject matter:[2] it is an ad-

**2.** Congress may well have thought that since its

language allowed exceptions to be created only

ministrative order demanding a certain cargo preference. But the limitation to exporting or importing countries says nothing about the *form* of legal mandate, i.e., whether the term includes administrative as well as direct statutory edicts.

Needless to say, the Sealift Command pursues the usual quest for support in the legislative history of § 10(c)(6). The quest is even more than usually unavailing and requires no comment.

If "law of the United States" is in this context ambiguous, we think the FMC's reading of the term to encompass the MarAd charter orders handily meets *Chevron's* requirement of reasonableness.

\* \* \*

■ We now turn to the residue of No. 93–1846, which indirectly poses the issue of whether MarAd acted within the scope of its delegated authority in issuing the original charter orders. In this phase of the case, Sea–Land, joined by intervenor APL, staunchly defends the original orders and thus continues the attack on the modification orders; the United States and Department of Transportation (MarAd's parent Department) defend the modification orders and thus, necessarily, attack the validity of the original orders. As a general matter, MarAd rested its original imposition of Condition 4 on § 41 of the 1916 Act, which empowers the agency to approve charter agreements "either absolutely or upon such conditions as the Secretary of Transportation prescribes." 46 U.S.C. app. § 839.

In No. 93–1846, it will be recalled, Sea–Land challenged MarAd's 1993 *modification* orders, which MarAd had justified exclusively by reference to OLC's theory that its *original* charter orders imposing Condition 4 were invalid under § 10(c)(6). If OLC's theory is wrong, the modification orders lack a necessary foundation, and the original orders must be reinstated. The FMC, to be sure, in denying relief to the Sealift Command, noted that application of § 10(c)(6)'s exception depended on the validity of the original charter

orders; but we do not think that observation miraculously expanded the set of issues properly raised in No. 93–1846, giving MarAd and the Sealift Command license to raise other possible attacks on the original orders. Thus, although MarAd's authority under § 41 of the 1916 Act is obviously limited—it cannot, for example, condition its approval on payment of a fee, see *Clapp v. United States,* 127 Ct.Cl. 505, 117 F.Supp. 576, 581 (Ct.Cl. 1954)—we confine ourselves to the single attack on the original orders that was put before us in No. 93–1846.

The United States re-asserts OLC's conclusion that "[w]ithout specific authorization, either in its own organic statute or in the other statute at issue, an agency lacks authority to require private parties to violate a federal statute." This is quite true, see *Maislin Indus., U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 134–35, 110 S.Ct. 2759, 2770–71, 111 L.Ed.2d 94 (1990), but irrelevant. Given the "except" clause and our earlier conclusion that valid MarAd orders are law for purposes of § 10(c)(6), MarAd was *not* requiring a violation of § 10(c)(6) so long as it was acting within its statutory authority. It was issuing orders that under § 10(c)(6) had the effect of triggering an exception to that section's otherwise broad prohibition; § 10(c)(6) cannot itself invalidate those triggering orders.

■ MarAd's belief that the original orders ran afoul of § 10(c)(6) was thus incorrect. And as this erroneous belief was the sole basis for the modification of the orders, the modifications cannot stand. An agency action, however permissible as an exercise of discretion, cannot be sustained "where it is based not on the agency's own judgment but on an erroneous view of the law." *Prill v. National Labor Relations Board,* 755 F.2d 941, 947 (D.C.Cir.1985); see also *Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[I]f the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law.").[3] In No.

by laws requiring an "allocation," such laws would necessarily deal with cargo preferences.

We do not reach the issue of whether there is any independent subject-matter prerequisite.

**3.** Some courts explain this via the principle that

93–1846, accordingly, we vacate the modification orders, thus automatically reinstating the orders imposing Condition 4. In consequence, Sea–Land's agreement does not violate § 10(c)(6), and the FMC's dismissal of the Sealift Command's complaint (appealed in No. 97–1084) was correct. We express no opinion as to whether at this stage the Sealift Command can initiate some new proceeding before or against MarAd, raising any new question about Condition 4 (e.g., a claim that its imposition was an abuse of discretion).

\* \* \*

■ We thus affirm the FMC's Order dismissing the Sealift Command's complaint. There remains the ALJ's finding, affirmed by the FMC, that Article 5(i) constituted an "allocation" within the meaning of § 10(c)(6). The only parties taking issue with that finding are Sea–Land and APL. Yet they have no complaint with the Order dismissing the Sealift Command's complaint against Sea–Land; they do not want anything other than a dismissal.[4] Instead, they take issue only with the part of the FMC's decision saying that Article 5(i) is an allocation.

. If they are asking for review merely of that determination, an immediate obstacle arises. The statute that provides our jurisdiction in this case, 28 U.S.C. § 2342(3), allows review of "rules, regulations, or final orders" of the FMC—not of reports, reasoning, or findings. See *AT&T v. FCC*, 602 F.2d 401, 406–07 (D.C.Cir.1979) (where AT&T challenged not the order but only some underlying findings, court lacked authority to hear appeal under § 2342(1), allowing review of "final orders" of FCC). Here the FMC's action appears to be only a finding: the ALJ found that Article 5(i) was an "allocation," and the FMC "ordered" that that finding "is

affirmed." We doubt whether the Commission's wrapping its finding in the mantle of an order can make it an order for purposes of § 2342; we have said that an FCC letter cannot be considered an order under that section (and the FCC-specific 47 U.S.C. § 402(a)) without "some modicum of injury, some concrete effect upon the station sufficient to support a court's jurisdiction," *Straus Communications, Inc. v. FCC*, 530 F.2d 1001, 1006 (D.C.Cir.1976), and the label placed by the agency on its action is normally not conclusive, *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 416, 62 S.Ct. 1194, 1199–1200, 86 L.Ed. 1563 (1942). In any event, apart from the statutory hurdle, there is an Article III barrier as well: Sea–Land and APL run afoul of the principle that prevailing parties lack standing to appeal.

■ Appellate courts "review[ ] judgments, not statements in opinions." *California v. Rooney*, 483 U.S. 307, 311, 107 S.Ct. 2852, 2854, 97 L.Ed.2d 258 (1987) (quoting *Black v. Cutter Laboratories*, 351 U.S. 292, 297, 76 S.Ct. 824, 827, 100 L.Ed. 1188 (1956)). Where the judgment gives a party all the relief requested, appeal may not be taken simply to challenge the court's reasoning. See, e.g., *In re Reporters Committee for Freedom of the Press*, 773 F.2d 1325, 1328 (D.C.Cir.1985) (citing *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242, 59 S.Ct. 860, 860–61, 83 L.Ed. 1263 (1939)).

Aware of this difficulty, Sea–Land and APL turn to *International Brotherhood of Elec. Workers v. ICC* ("*IBEW*"), 862 F.2d 330 (D.C.Cir.1988), but the exception it carves out is too small to accommodate this case.

---

agency action founded on mistake of law is arbitrary and capricious within the meaning of § 706(2) of the Administrative Procedure Act. See, e.g., *Maez v. Mountain States Tel. & Tel., Inc.*, 54 F.3d 1488, 1505 (10th Cir.1995).

4. The FMC Order dismisses the Sealift Command's complaint, "without prejudice to reinstitution of this proceeding upon motion to reinstate the complaint, after issuance of the mandate in D.C.Cir. No. 93–1846." A prevailing party may appeal a dismissal without prejudice on the grounds that it wants one with prejudice, see, e.g., *LaBuhn v. Bulkmatic*

*Transport Co.,* · 865 F.2d 119, 122 (7th Cir. 1988), but given our decision that the original MarAd orders were within the scope of MarAd's authority, the FMC Order will become dismissal with prejudice by its own terms. Once it has failed to prevail in No. 93–1846, the Sealift Command cannot reinstate its complaint before the FMC. In any case, the Sea–Land/APL brief makes nothing of the FMC's "without prejudice" characterization, asking only that its "ruling" on the allocation issue be reversed or vacated. Pet. Br. at 44.

In *IBEW,* the petitioner union challenged the ICC's determination that it had jurisdiction to review an arbitrator's award. The ICC had affirmed the award, making the union the prevailing party, but we found that the union had standing to challenge the intermediate decision as to the ICC's jurisdiction. Tellingly for present purposes, we noted that the union was "not merely quibbling over the agency's rationale in a case in which it has prevailed," since what was at issue was not the agency's reasoning but its "decision to review arbitration awards." 862 F.2d at 334. That decision was a policy of general applicability, with the same effects as though "the Commission had promulgated a rule," *id.,* and the policy inflicted cognizable harm. Indeed, we have since characterized *IBEW* as standing for the proposition that "a party who prevails on a challenge to a rule *as applied* is nonetheless permitted to appeal from an adverse decision on a facial challenge to the rule itself." *Telecommunications Research and Action Center v. FCC,* 917 F.2d 585, 588 (D.C.Cir.1990); compare *id.* at 588–89 (Silberman, J., concurring) (agreeing on judgment as to look of standing, but distinguishing *IBEW* as a case allowing a winning party "to challenge a general rule if that rule remains in existence and creates a cognizable harm through its effects on that party's future rights").

■ But, petitioners might protest, every adjudication embodies at least one rule, often several. The FMC's determination that agreements like Sea–Land's are allocations is a generally applicable interpretation of § 10(c)(6); why cannot Sea–Land appeal it? The answer is that what petitioners fail to show is not so much the rule as the harm. *IBEW*'s facts were quite different. The agency's assertion of jurisdiction there imposed another layer of review on arbitration awards. The decision did not suggest that petitioners would lose future litigation; it ensured that future litigation would be more costly, no matter how often petitioners prevailed. The concrete cost of an additional proceeding is a cognizable Article III injury. Cf. *Telecommunications Research and Action Center v. FCC,* 917 F.2d at 588–89 (Silberman, J., concurring) (noting need for "cognizable harm"). But mere precedential

effect within an agency is not, alone, enough to create Article III standing, no matter how foreseeable the future litigation. See, e.g., *Abbs v. Sullivan,* 963 F.2d 918, 924 (7th Cir.1992); *Radiofone, Inc. v. Federal Communications Comm'n,* 759 F.2d 936, 938 (D.C.Cir.1985) (separate opinion of Scalia, J.); see generally *Shell Oil Co. v. FERC,* 47 F.3d 1186, 1200–03 (D.C.Cir.1995) (reviewing types of continuing harm from contents of decision that are enough to give winner of the judgment standing); *Crowley Caribbean Transport, Inc. v. Pena,* 37 F.3d 671 (D.C.Cir.1994) (no standing to assail agency's legal reasoning absent concrete injury). Sea–Land and APL have pointed us to no consequences flowing from the FMC's general interpretation of § 10(c)(6) that suffice to confer standing.

If not the FMC's general interpretation of § 10(c)(6)'s term "allocation," what of its particular classification of Article 5(i) and equivalent language? Sea–Land and APL pin their hopes on a dictum in *IBEW*—the suggestion that "the prospect that an unfavorable ruling would act as collateral estoppel in subsequent litigation" is sufficient to confer standing on an otherwise prevailing party. *IBEW,* 862 F.2d at 334 (cited in Pet. Br. at 2). The dictum in turn relied on *Electrical Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939); see also *Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 334–35 & n. 7, 100 S.Ct. 1166, 1171–72 & n. 7, 63 L.Ed.2d 427 (1980) (explaining *Electrical Fittings*). In fact, however, review in *Electrical Fittings* of the findings against the winning party did not turn on collateral estoppel effects; as the Court later noted, the *Electrical Fittings* Court did not question the court of appeals's statement that there would be no preclusive effect. See *Roper,* 445 U.S. at 334–35, 100 S.Ct. at 1171–72.

■ In any event, an argument from collateral estoppel consequences has elements of circularity. As collateral estoppel does not apply to an unappealable determination, see *Warner/Elektra/Atlantic Corp. v. County of DuPage,* 991 F.2d 1280, 1282 (7th Cir.1993), simply holding a ruling unappealable elimi-

nates any prospect of preclusion, *id.* at 1282–83. To cut out of the circle one must inquire whether the disputed component of the agency decision has the prerequisites for collateral estoppel independent of appealability; if not, then collateral estoppel cannot be the basis for appealability.

■ We need not here explore the conditions under which an administrative determination might have an issue-preclusive effect in a later judicial proceeding. To have such an effect, it must not only satisfy the ordinary requirements of collateral estoppel but must also result from a process sufficiently similar to a judicial proceeding. See Restatement (Second) of Judgments § 83 (1982). Here, the FMC's decision on the "allocation" issue lacks one of the ordinary prerequisites: it was not necessary to the judgment. See, e.g., *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Abbs,* 963 F.2d at 924. Thus, quite independently of their lack of appealability, FMC's findings on allocation can give Sea–Land no reasonable concern about preclusive effect. Indeed, ongoing FMC proceedings show that the agency understands this: while maintaining its position on § 10(c)(6), it does not suggest that the findings are preclusive. See 63 Fed.Reg. 3115, 3116 (1998).

Neither the general interpretation of § 10(c)(6), nor the specific findings about these agreements, makes the FMC's decision adverse to Sea–Land and APL. Without an adverse judgment, or extraordinary circumstances such as enunciation of a rule with the kind of injury inflicted in *IBEW,* objectionable interpretations and findings are not enough to ground an appeal.

■ That does not mean that Sea–Land and APL had no way of challenging the FMC's decision on the allocation issue. The Sealift Command's appeal, No. 97–1084, is properly before us, and Sea–Land and APL have intervened in support of the FMC. They could, as intervenors, properly have urged affirmance or remand on any ground presented to the FMC, including their argument about the allocation clause. See *Showtime Networks, Inc. v. FCC,* 932 F.2d 1, 4–5 (D.C.Cir.1991). This method of presenting

issues, defensively and in the alternative, is the usual way for prevailing parties to protect themselves on appeal from the risk that the appellate court may reverse the decisions attacked by the appellants. Sea–Land and APL did not employ it; their brief as intervenors, at 2, explicitly restricts itself to the question of whether MarAd orders are "law of the United States."

An alternative risk-control device would have been a "conditional" cross-appeal, asking to be heard only if we accepted the Sealift Command's argument about the "except" clause. While some circuits treat conditional cross-appeals as outside their jurisdiction in these circumstances, evidently on the ground that parties may rely on the more conventional intervention procedure, see, e.g., *Great American Audio Corp. v. Metacom, Inc.,* 938 F.2d 16, 19 (2d Cir.1991), most apparently accept them. See generally 15A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3902 at 78–79 (1992) (collecting cases).

The carriers in fact framed their appeal unconditionally, but this circuit, in *Showtime,* 932 F.2d at 5, appeared willing to entertain even a conditional cross-appeal styled as an unconditional petition for review—if the feared judicial embrace of the appellant's position materialized. See also *Hartman v. Duffey,* 19 F.3d 1459, 1465–66 (D.C.Cir.1994) (discussing conditional cross-appeals). Thus, if we had accepted the Sealift Command's position on § 10(c)(6)'s exception, we would hesitate to reverse the FMC without considering Sea–Land's and APL's claims on the "allocation" issue.

But where, as here, the losing party's theories are rejected, courts appear uniformly to dismiss a conditional cross-appeal. *Showtime* reaches this result, noting to be sure that the party bringing the appeal conceded its mootness in such circumstances. See 932 F.2d at 5; see also, e.g., *Maschka v. Genuine Parts Co.,* 122 F.3d 566, 572 n. 4 (8th Cir. 1997) (dismissing cross-appeal as moot after affirming district court); *Wilson v. New York,* 89 F.3d 32 (2d Cir.1996) ("no occasion to reach issues" without reversal); *Hartman,*

19 F.3d at 1465 (stating that "the cross-appeal is reached only if and when the appellate court decides to reverse or modify the main judgment"); see generally Wright, et al., Federal Practice & Procedure, § 3902 at 78–79 (stating that courts decide cross-appeals "only if disposition of the appeal makes it appropriate"); cf. *Council 31 v. Ward,* 978 F.2d 373, 380 (7th Cir.1992) (noting that reversal "invigorat[es] the cross-appeal and support[s] our jurisdiction"). While characterizing such a cross-appeal as moot may be in tension with the general recognition that a court's acceptance of one of an appellant's two independent bases for attack does not render the second basis moot, see *Air Line Pilots Ass'n, Int'l v. UAL Corp.,* 897 F.2d 1394, 1397 (7th Cir.1990), this case presents no reason to break out of conventional practice. Thus, on affirming the FMC decision on the operation of the "except" clause, we dismiss Sea–Land's appeal without reaching the merits.

\* \* \*

In No. 93–1846 we vacate MarAd's modifications to the charter orders; in No. 97–1083 and consolidated cases we affirm the FMC's dismissal of the Sealift Command's complaint.

*So ordered.*