## WILLIAMS GAS PROCESSING–GULF COAST COMPANY, L.P., Petitioner,

### v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

### ANR Pipeline Company, et al., Intervenors.

### No. 97–1182.

United States Court of Appeals, District of Columbia Circuit.

Argued May 8, 1998.

Decided June 9, 1998.

James T. McManus argued the cause for petitioner. With him on the briefs were Joseph S. Koury and Mari M. Ramsey.

Patricia L. Weiss, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor.

Stephen L. Teichler argued the cause for intervenor Exxon Corporation. With him on the brief was Douglas W. Rasch.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

WILLIAMS, Circuit Judge:

Shell Gas Pipeline Company proposed to build some natural gas facilities in the Gulf of Mexico off the Louisiana Coast, to be known as the Garden Banks Gathering System. In 1995 it filed a petition with the Federal Energy Regulatory Commission requesting that they be classified as "gathering" facilities, and therefore, under § 1(b) of the Natural Gas Act, 15 U.S.C. § 717(b), free of FERC's regulatory jurisdiction. The Commission granted the request for some of the facilities, but decided that a 50–mile long, 30–inch wide line, the Enchilada Pipeline, would be a gas "transportation" facility rather than a gathering facility, and so would be subject to its jurisdiction. *Shell Gas Pipeline Co.*, 74 FERC ¶ 61,277 (1996) ("Order"). Shell re-

sponded to the Order in two ways. First, it filed under § 7(c) of the Act for a certificate authorizing construction and operation of the Enchilada line, which it received and accepted under protest. Accordingly it started construction. Meanwhile it sought rehearing of the adverse classification decision, but the Commission denied rehearing. *Shell Gas Pipeline Co.*, 78 FERC ¶ 61,286 (1997) ("Order on Rehearing"). See *id.* at 62,245 (describing Shell's request for certification, grant of the request, and Shell's acceptance under protest). Shell has sought no judicial relief from FERC's classification decision.

Williams Gas Processing, however, which had participated in the initial classification proceeding and the rehearing petition, says that it is a "person aggrieved" by the Orders within the meaning of § 19(b) of the Act, 15 U.S.C. § 717r(b), and seeks review. It has pending before the Commission a petition seeking re-classification as non-jurisdictional certain facilities owned by its affiliate, Transcontinental Gas Pipe Line Corp. ("Transco"), which it proposes to acquire from Transco in a "spindown" transaction. The facilities are evidently similar to the Enchilada and are located in its vicinity. Although Williams regards the precedential effect of the Enchilada classification as injurious, it does not push that as its main injury, as it recognizes our long line of decisions rejecting claims of standing based merely on supposed adverse precedential effect. If the Commission applies the Shell decision as a precedent in a way adverse to Williams's application, Williams will be free to try to convince a court of the error in the principle applied. See, e.g., *Sea–Land Service, Inc. v. Department of Transportation*, 137 F.3d 640, 647–49 (D.C.Cir.1998).

But Williams names an independent source of injury. It points to Commission decisions suggesting that the classification of facilities in the Outer Continental Shelf ("OCS") as transportation or gathering may be affected by the character of the lines in the vicinity, so that classification of a line as transportation is more likely if the neighboring lines are so classified. The Order here, it says, is yet another in a series of decisions that have too readily classified OCS facilities as juris-

dictional; because Shell's Enchilada line is near the Transco facilities, the Order increases the likelihood that the Commission will reject its efforts to reclassify the latter as gathering. It thus asserts a novel path-dependency theory, under which the contested decision is said to injure the protester by changing the context in which its own conduct will be judged, independent of any precedential effect. Although we are ready to assume the theoretical soundness of Williams's claim, we find that Williams has failed to establish in this case the kind of effects that are minimally necessary for it to be aggrieved under the theory.

Williams's path-dependency theory turns on two propositions: first, that proximity to interstate transportation facilities plays a large role in the Commission's classification principles, and second, that the addition of the Enchilada line to the facilities already so classified materially alters the odds of Transco's own facilities being classified as jurisdictional. There are weaknesses in both propositions.

We start with the second. The briefs do not point to material in the record establishing the exact geographic relation between the Enchilada and the Transco facilities, so we asked at oral argument whether, given the pre-existing lines classified as transportation rather than gathering, the Enchilada's classification critically changed the chances of Williams's reclassification petition. Williams's counsel acknowledged that it did not. Moreover, counsel for the Commission indicated (and Williams's counsel did not deny) that if the propriety of a prior classification became pertinent in the Transco case, the Commission would entertain the claim that it had misclassified the relevant facilities. Accordingly, even if Commission precedent assigned a very large role to the status of adjacent facilities, it is not apparent that Williams has shown the sort of serious impact on its case that would constitute the sort of injury—"actual or imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)(internal quotations omitted)—that amounts to aggrievement.

Moreover, the Commission does not appear to give surrounding classifications the pre-eminence that Williams suggests. In determining the jurisdictional status of pipelines, it applies a "primary function" test, looking to the role the pipeline plays in the natural gas network, i.e., whether it serves primarily to gather gas from the wellhead, or to transport gas already gathered. It has said that the relevant factors include: (1) the length and diameter of the line, (2) the extension of the line beyond the central point in the field, (3) the line's geographic configuration, (4) the location of compressors and processing plants, (5) the location of wells along all or part of the facility, and (6) the operating pressure of the lines. Order, 74 FERC at 61,895–96 & n. 23 (citing *Farmland Indus., Inc.*, 23 FERC ¶ 61,063, at 61,143 (1983)).

For offshore facilities the Commission has taken the view that it must adjust its application of these criteria. Indicia such as processor locations and pipeline lengths may be misleading, since the processing tends to take place onshore after long trips from the wellhead—increasingly long trips, as technological advances make possible more distant and deeper exploitation. Thus, FERC has modified the primary function test in two significant ways. First, it decided in *Amerada Hess,* 52 FERC ¶ 61,268, at 61,986 (1991), that the OCS conditions justify treating as gathering facilities pipelines of greater length and diameter than would be the case onshore:

[A] relatively long pipeline on the OCS may be consistent with a primary function of 'gathering or production' whereas an onshore pipeline of similar length would not. Therefore, in applying the modified 'primary function' test to OCS pipeline facilities the Commission will apply, in effect, a sliding scale which will allow the use of gathering pipelines of increasing lengths and diameters in correlation to the distance from shore and the water depth of the offshore production area.

*Id.* at 61,988. Second, FERC announced a policy, which it applied in the Shell proceedings, that it would now apply a presumption that facilities designed to collect gas at 200 meters or greater depth are gathering facilities, "up to the point or points of potential interconnection with the interstate pipeline grid. From there on, the Commission will apply its 'primary function' test to determine whether the facilities will be considered to be jurisdictional...." Order, 74 FERC at 61,-896 (citing Docket No. RM 96–5–000, Statement of Policy, 74 FERC ¶ 61,222 (1996)).

To be sure, some of FERC's language in its initial application of the modified test to the Enchilada pipeline tended to support Williams's claim that proximity is destiny. In particular, it noted that the line "is proximate to jurisdictional lines," and so "may be considered as the equivalent of a capacity addition to the existing interstate pipeline infrastructure in the vicinity." Order, 74 FERC at 61,897.

In petitions for re-hearing, Williams and others challenged this determination, on the grounds that the Enchilada line's mere proximity to other jurisdictional pipelines, themselves allegedly misclassified, had been the dispositive factor in FERC's determination, irrespective of the line's individual functional characteristics.

In denying the petitions for rehearing, FERC conceded that proximity to jurisdictional lines was a factor in its decision. But it rejected the petitioners' characterization of the role of that factor. It explained, first, that proximity to points of actual or potential interconnection with the interstate transportation grid was the occasion for the lapse of the Commission's presumption that a deepwater line is a gathering facility, and thus the trigger for the application of the test in its post-*Amerada Hess* flexible form:

[R]ather than marking a change in function, the point(s) of potential connection of a facility merely denotes the termination of the presumption that part of a deep water system is gathering.

Order on Rehearing, 78 FERC at 62,247. Second, FERC enumerated a number of other factors, beyond proximity to other jurisdictional pipelines, that played a role in its application of the primary function test to the Enchilada: the relatively large diameter of the Enchilada line (indicative of a transmission function), its role as the central point for

gas collection (and so "representative of other long-haul transportation systems"), its function as a "capacity addition" to the transportation grid, its location in shallow waters, and the absence of any function of collecting gas from downstream wells, *id.* at 62,250–54.

We of course express no opinion on the merits of the Order or the Order on Rehearing. We cite them solely as confirmation that in fact the Commission's disposition of the Shell application will play only a modest role in its treatment of Transco's petition, and that, accordingly, Williams is not aggrieved.

We recognize that this decision leaves open a theoretical possibility that Williams's position can suffer death by inches—the Commission's errors could accrete so gradually that no one prior step would be significant enough to afford it standing. But where the accretions are small, it follows as a matter of logic that, in order to build into a massive obstacle for the late applicant, there must be many of them. This increases the likelihood that some similarly positioned applicant will find it worthwhile to challenge a Commission decision adverse to it. While a suit controlled by another is not the same as a party's own suit, we know from class action law that in some cases it is enough. We think it sufficient to close the theoretical gap that results here from the application of traditional standing law.

The petition for review is

*Dismissed.*